SOUTHDOWN, INC., A LOUISIANA CORPORATION, APPEL-LANT AND CROSS–RESPONDENT, v. CLARA L. McGIN-NIS, ET AL., RESPONDENTS AND CROSS–APPELLANTS.

No. 6991

May 30, 1973                    510 P.2d 636

[Rehearing denied June 25, 1973]

*Baker & Botts,* and *Alvin M. Owsley, Jr.,* of Houston, Texas, and *Foley Brothers,* of Las Vegas, for Appellant and Cross-Respondent.

*Coleman & O'Connell,* of Los Angeles, California, *Lionel Sawyer Collins & Wartman,* and *McNamee, McNamee & Rittenhouse,* of Las Vegas, for Respondents and Cross-Appellants.

## OPINION

By the Court, THOMPSON, C. J.:

Clara L. McGinnis, et al., the dissident stockholders of C. Leonardt Improvement Company (CLI) who hold 581 common shares of the stock of that company, filed a petition with the district court to have appraisers appointed to determine the fair cash value of each share of stock owned and held by them in CLI.[1] Three appraisers were appointed, and an

[1]NRS 78.507. "If all of the stock of a subsidiary Nevada corporation party to a merger effected under NRS 78.486 is not owned by the parent corporation immediately prior to the merger, the surviving corporation shall, within 10 days after the effective date of the merger, notify each stockholder of such Nevada corporation that the merger

appraisal report was filed with the court which it confirmed. It was the opinion of the appraisers that the fair cash value of each $100 par value common share of CLI, as of November 18, 1970, was $12,650 and that the fair cash value of the 581 common shares owned by Clara L. McGinnis, et al. on that date was, therefore, $7,349,650. Judgment was entered accordingly. Pre-judgment interest was denied. Southdown, Inc., has appealed, challenging the court's confirmation of the valuation of the appraisers. Clara L. McGinnis, et al. have cross-appealed contending that the district court committed error in denying pre-judgment interest.

---

has become effective. The notice shall be sent by certified or registered mail, return receipt requested, addressed to the stockholder at his address as it appears on the records of the corporation. Any such stockholder may, within 20 days after the date of mailing of the notice, demand in writing from the surviving corporation payment of the value of his stock exclusive of any element of value arising from the expectation or accomplishment of the merger."

NRS 78.510. "1. If within 30 days after the date written demand is served upon the surviving or consolidated corporation, the stockholder and the surviving or consolidated corporation fail to come to an agreement as to the fair cash value of the shares, the stockholder, provided he has complied with the conditions set forth in NRS 78.505 or 78.507, may appeal by petition to the district court of the county in which the principal office of the surviving or consolidated corporation is located, if such corporation is a corporation organized under the laws of this state, or to the second judicial district court of this state, if such corporation is a corporation organized under the laws of any state other than the laws of this state or under the laws of any foreign country, to appoint three appraisers to appraise the fair cash value of such stockholder's shares.

"2. The appraisers shall proceed forthwith to determine the fair cash value per share of the stock, and the appraisers, or a majority of them, shall make a report within the time fixed by the court and shall file the report in court. The report of the appraisers as to the fair cash value of the shares, if not opposed within 10 days after the report shall have been filed in court, shall be confirmed by the court, and when confirmed shall be final and conclusive; but if the report is opposed, the opposition shall be tried summarily and judgment rendered thereon by the court.

"3. If the appraisers or a majority of them fail to make and file a report within 10 days, or within such further time as may be allowed by the court, the court shall determine the fair cash value of the shares and render judgment therefor.

"4. The costs of the proceeding, including reasonable compensation to the appraisers to be fixed by the court, shall be assessed or apportioned, as the court may consider equitable, but if the appraisal exceed the price offered by the surviving or consolidated corporation, the corporation shall pay such costs.

"5. Any party shall have the right to appeal according to existing laws and rules of court, provided the appeal be taken within 10 days after the signing of the judgment."

Southdown, Inc., the appellant and cross-respondent, is the successor corporation to CLI by reason of two corporate mergers. Southdown is a publicly held Louisiana corporation based in Houston, Texas. By February of 1970 it had acquired control of CLI and two of CLI's closely held subsidiary companies, Southwestern Cement Associates (SWCA) and Southwestern Portland Cement Company (SWPCC).[2]

In November 1970, Southdown incorporated 1034 Wilshire Corporation, a Nevada corporation, with an authorized capital of 1000 outstanding shares of common stock. It was proposed that the 1034 Wilshire Corporation be merged into CLI through an exchange of common stock. This merger was effected on November 19, 1970. Thereafter, on December 4, 1970, CLI was merged into Southdown.

The proposed exchange of common stock between 1034 Wilshire Corporation and CLI was refused by Clara L. McGinnis, et al. representing 581 common shares on the ground that it was not a fair offer for their stockholdings in CLI. On January 9, 1971, Southdown offered McGinnis, et al. $7,725 per share for the 581 common shares, which offer was refused, and this proceeding ensued.

On the day prior to the merger of 1034 Wilshire into CLI, that is, on November 18, 1970, Southdown owned 1530 common shares of CLI or 58.84 percent of the total, McGinnis, et al. owned 581 shares or 22.34 percent of the total, and others owned 489 shares or 18.82 percent of the total. The court instructed the appraisers to value the CLI stock as of that date. That date was selected in order to avoid any element of value arising from expectation of the merger. NRS 78.505.

The court's instructions to the appraisers, approved by counsel for the respective parties, advised that (a) fair cash value is the amount of money at which property (shares of capital stock) would most probably exchange between a buyer, willing to buy, and a seller, willing to sell, both buyer and seller being fully knowledgeable about the enterprise but under no compulsion to buy or sell, and both buyer and seller contemplating the retention of all facilities involved at their present locations for a continuation as a part of the existing business enterprise (b) the basic concept of the appraisal is

[2]CLI was a privately owned holding company with investment interests in marketable securities, real estate and two closely held subsidiary companies, SWCA and SWPCC. CLI had a direct 12.12 percent interest in the latter company and through its direct 80 percent interest in the former, had a total 55.92 percent effective interest in the common stock of SWPCC.

that the dissenting stockholders are to be paid for that which has been taken from them, that is, their proportionate interest in a going concern and (c) the appraisers were to consider and weigh as they deem fit in their expert opinion, all factors which bear upon fair cash value as defined by the court.

The appraisers utilized the three commonly recognized approaches for developing fair cash value, the market, cost, and income methods. The market approach produces an estimate of value of property by comparing it with similar properties of the same character which have been sold recently or are currently offered for sale in the same or competing areas. The cost approach develops the cost to acquire in like kind or replacement in like utility the property of replaceable character discounted for all factors that affect value, as physical deterioration, functional and economic obsolescence, and to which is added the value of the land. The income approach concerns itself with the present worth of the future benefits of a property. This is generally measured by net income which is capitalized to an estimate of value.

The appraisers' task was a large one. As already indicated, CLI's principal assets included investment in marketable securities, two closely held subsidiary companies (SWCA and SWPCC), and real estate consisting of a shopping center in Sunnyvale, California. Except for the shopping center rental income, most of its income was derived from dividends.

Southwestern Cement Associates (SWCA) owned no real estate or any other assets except for its investment in Southwestern Portland Cement Company. Its income was derived from dividends from that investment.

Southwestern Portland Cement Company is a closely held West Virginia corporation, owning quarries and manufacturing facilities in California, Ohio and Texas for the production and marketing of cement. SWPCC also owned two subsidiary companies—Vortec Products Company, a California corporation which manufactures particle classifying equipment, and Mojave Northern Railroad Company, a corporate private carrier owning a certain right of way. SWPCC also owns a 25 percent interest in Black River Mining Company joint venture, a limestone mining operation.

All of these major properties were inspected by the appraisers and all relevant data secured.

Southdown's objections to the court confirmation of the appraisal report are three. First, it complains that the report

did not assign specific weights to the three elements of valuation, that is, the market, cost and income elements or approaches to value. We summarily reject this complaint. One of the proposed instructions submitted to the court would have required the appraisers to weigh each element. That instruction was rejected and changed to read that the appraisers "shall detail the factors considered and the reasoning leading to the conclusion of valuation." This change was approved by both parties.

Second, Southdown asserts that the appraisal report is unreliable since it failed to consider and give weight to the consequence of the termination of dividend payments on the common stock of CLI, SWCA, and SWPCC.

Third, Southdown contends that the appraisal report is unreliable since it failed to consider and give effect to the market price of the stock of CLI, SWCA and SWPCC. We turn to consider the second and third contentions in the light of the relevant facts appearing from the record before us.

1. Certain preliminary observations may be useful. When reviewing court confirmation of an appraisal report, the findings of the appraisers are not to be disturbed unless clearly wrong. Application of Delaware Racing Association, 213 A.2d 203, 207 (Del. 1965); Jeffrey v. American Screw Company, 201 A.2d 146, 152 (R.I. 1964); American General Corporation v. Camp, 190 A. 225, 230 (Md. 1937). This standard is not dissimilar to that governing an ordinary trial before a court where we are not to set aside the findings made unless they are clearly erroneous. NRCP 52(a).

The words "fair cash value" as used in NRS 78.150 have been construed by courts elsewhere to mean the intrinsic value of the dissenting shareholder's interest determined from the assets and liabilities of the corporation considered in the light of every factor bearing on value. Roessler v. Security Savings & Loan Co., 72 N.E.2d 259, 260 (Ohio 1947); Lucas v. Pembroke Water Co., 135 S.E.2d 147, 150 (Va. 1964); Porter v. C. O. Porter Machinery Co., 58 N.W.2d 135, 136 (Mich. 1953); Adams v. United States Distributing Corporation, 34 S.E.2d 244, 250 (Va. 1945). We so construe NRS 78.510. The instructions of the court herebefore mentioned appear to have had this general concept in mind.

a) Southdown asks that we reject the appraisal report as unreliable since it failed to consider and give weight to the

consequence of the termination of divided payments on the common stock of CLI, SWCA and SWPCC.

In March of 1970, Southdown assumed the direction and control of those companies, and elected no longer to pay regular dividends on the common stock thereof. It is Southdown's position that such decision was the responsibility of the directors; that shareholders do not have a vested right to receive dividends. Perhaps this is true. Southwestern Portland Cement Co. v. Latta & Happer, 193 S.W. 1115 (Tex.Civ.App. 1917). It does not inevitably follow, however, as Southdown contends, that the failure to pay dividends on common stock reflects a diminished value of that stock. Low dividends, or even the absence of dividends, are not necessarily a sign of financial weakness. Perhaps the directors preferred to retain earnings in the business for the purpose of expansion, or for a variety of other reasons, rather than to pay dividends. Funds paid out in dividends are not available for corporate growth. On the other hand, continued corporate earnings without the payment of dividends would increase the equity value of the stock. Thus, it would seem that the capacity of the company to pay dividends would carry greater weight in valuing the shareholder's interest than would consideration of whether dividends were paid. Laird v. Commissioner of Internal Revenue, 85 F.2d 598, 601 (3 Cir. 1936); Blackard v. Jones, 62 F.Supp. 234, 236, Note. 2 (D.C.W.D. Okla. 1944). This is especially true when valuing the interest of stockholders in a closely held company.

The record shows that CLI had paid dividends every year from 1923 through 1969. There is nothing to suggest that it lacked the capacity to do so thereafter. The appraisal report shows that for the years 1965 through 1969, the consolidated earnings and dividends paid per share were as noted below.[3] The appraisers' comment: "while C. L. I.'s consolidated earnings have fluctuated yearly, its dividends payout has increased and averaged slightly more than 74 percent for the five years, 1965 through 1969. The trend of dividends payments indicates a prospective payout level of $500 per share." In the view of

| [3]Year | Earnings per Share | Dividends per Share |
|---|---|---|
| 1965 | $652.63 | $407.00 |
| 1966 | 542.28 | 405.00 |
| 1967 | 379.05 | 410.00 |
| 1968 | 669.81 | 420.00 |
| 1969 | 570.13 | 450.00 |
| Average | $562.78 | $418.40 |

the appraisers the capacity to pay dividends apparently existed, notwithstanding the decision of the directors not to do so. In these circumstances it was permissible for the appraisers to conclude that the termination of dividend payments did not work to diminish the intrinsic value of the 581 common shares of CLI held by Clara L. McGinnis, et al.

b) The reliability of the appraisal report next is challenged upon the ground that it failed to accord appropriate significance to the market price of CLI, SWCA and SWPCC stock. The market price at which a stock is selling is most reliable when regular published quotations are available. Levin v. Midland-Ross Corporation, 194 A.2d 50, 53, 54, (Del. Ch. 1963). It is much less reliable when the trading is irregular. Sporborg v. City Specialty Store, Inc., 123 A.2d 121, 124 (Del. Ch. 1956); American General Corp. v. Camp, 190 A. 225 (Md. 1937). CLI and SWCA were holding companies, their principal asset being their investment in SWPCC. There was neither an active nor a public market in CLI or its two subsidiaries. None of the companies had ever been listed on the exchange or sold over the counter.

Moreover, the market price of stock is less reliable when affected by manipulation and outside pressure, Sporborg v. City Speciality Store, Inc., supra, or rumor of impending merger, Bache & Co. v. General Instrument Corp., 198 A.2d 759 (N.J. 1964). Here, Southdown controlled CLI, had issued a no-dividend policy, and a merger was forthcoming. It was permissible for the appraisers to consider all of these circumstances.

It is true that Southdown acquired CLI's common stock at a price of $12,600 per share pursuant to privately negotiated agreements with the respective selling stockholders. Certain trusts negotiated for and received payment in cash. The other selling stockholders received payment in the form of Southdown's 7½ percent notes which were convertible into Southdown stock. Southdown contends that its stock at that time was depressed below the conversion price and that the market price of its stock should be the measure of the value of the notes and, hence, the value of the CLI stock. The appraisers were not obliged to value CLI's common stock in the manner now asserted by Southdown.

The court instructed the appraisers to utilize the willing-seller, willing-buyer standard in arriving at fair cash value. Counsel for the parties approved that instruction. When a

stock is not actively traded, as here, that standard may contemplate a "hypothetical" market price, which allows the consideration of all relevant factors bearing upon value. Vought v. Republic-Franklin Insurance Company, 192 N.E.2d 332, 334, (Ohio App. 1962). This may involve a comparison of the company (in this instance SWPCC, the main asset of CLI) to similar corporations in the cement producing business whose stocks are actively traded. The appraisers utilized this recognized technique in the appraisal before us, and cannot be faulted for doing so. Accordingly, this challenge to the appraisal does not mandate a reversal.

2. Other attacks upon the appraisal report are denied out-of-hand. The appraisers did adhere to the instructions of the court; they made adequate financial investment analysis; and the report demonstrates that the appraisers fully understood the events leading up to the need for an appraisal.

The order of the district court confirming the appraisal report is affirmed.

MOWBRAY, GUNDERSON, BATJER, and ZENOFF, JJ., concur.

## OPINION ON CROSS–APPEAL

By the Court, GUNDERSON, J.:

Concerning the cross-appeal, Justice Batjer, Justice Zenoff and I believe the minority shareholders are entitled to pre-judgment interest on the "fair cash value" of their stock interests from the date they were taken by merger. Our brethren believe, to the contrary, that Nevada law allows a corporation to assume minority shareholders' stock interests through a merger, offer payment almost 40% less than "fair cash value," and have no liability whatever to pay interest on the value of the stock taken until such time as the minority shareholders can force a court adjudication of value.

It is critical to notice that, under Nevada law, the interests and rights of minority shareholders are divested, and they attain creditor status, as soon as they demand payment. NRS 78.515(1).[1] Thus, our statutory law is consistent with what

[1] Hence, cases cited by our brother Thompson, decided under quite different statutory schemes, seem inapposite. For example, in Pittston Co. v. O'Hara, 63 S.E.2d 34 (Va. 1951), the controlling statute provided that a shareholder's rights would continue until his interests were adjudicated, and the amount of the judgment therefor was deposited in court.

the common law has long declared: that the taking of another's property for one's own use implies a contractual obligation to pay therefor. 1 Corbin Contracts, § 18 et seq.

When there is no express contract in writing fixing a different rate of interest, Nevada law provides that interest "shall be allowed at the rate of 7 percent per annum upon all money from the time it becomes due . . . [u]pon contracts, express or implied, other than book accounts." NRS 99.040(1). As aforesaid, "fair cash value" became due to the minority shareholders at that point in time when they achieved "creditor status." The fact that the amount due was then not yet judicially determined is quite immaterial. Paradise Homes v. Central Surety, 84 Nev. 109, 437 P.2d 78 (1968); Close v. Isbell Construction Co., 86 Nev. 524, 471 P.2d 257 (1970); Brandon v. Travitsky, 86 Nev. 613, 472 P.2d 353 (1970); State Farm Mut. Auto. v. Christensen, 88 Nev. 160, 494 P.2d 552 (1972).

To the extent that it denied pre-judgment interest from the date of the merger, the district court's judgment is reversed, and the case is remanded with instructions to amend the judgment to include appropriate interest.

BATJER and ZENOFF, JJ., concur.

THOMPSON, C. J., dissenting:

The cross-appellants contend that the district court erred in denying prejudgment interest on the appraisal award of $7,439,650. They claim entitlement to such interest from November 19, 1970, the date of the merger of CLI into Southdown, to May 8, 1972, the date of court confirmation of the appraisal.

The appraisal and court confirmation statute is silent as to interest. The cross-appellants urge that the statute should be construed to allow prejudgment interest in order to accommodate its underlying purpose. Moreover, they suggest that NRS 99.040(1) providing for interest "upon contracts" upon "all money from the time it becomes due" covers the issue before us. Finally, they argue that constitutional due process commands such allowance.

1. Shareholders dissenting to the merger lose ownership rights in the corporation and become creditors.[1] They may not thereafter vote, nor may they receive dividends. By reason of

[1]NRS 78.515(1): "On the making of the demand in writing as provided in NRS 78.505, or 78.507, any such stockholder shall cease to be a stockholder in the surviving or consolidated corporation and shall

this circumstance, the cross-appellants argue that it would be unfair to allow the corporation to enjoy interest-free use of the dissenters' money pending appraisal and court action thereon. This, they suggest, would encourage the corporation to offer a low price for the dissenters' shares and thereby frustrate reaching an agreement upon fair cash value.

A New York court, considering a Delaware statute which did not provide for interest, ruled that "simple justice" requires the payment of interest on the value of the dissenters' stock from the time they are deprived of it. Skipwith v. Federal Water and Gas Corporation, 56 N.Y.S.2d 804, 807 (Sup.Ct. N.Y. 1945). And, in Jones v. Missouri-Edison Electric Co., 233 F. 49, 53 (8th Cir. 1916), the court allowed interest from the date of the merger. The Skipwith "simple justice" approach has been flatly rejected by other courts. Meade v. Pacific Gamble Robinson Co., 51 A.2d 313, 317, 320 (Del. Ch. 1947); In re Erlanger, 142 N.E. 571, 573 (N.Y. 1923); In re Janssen Dairy Corporation, 64 A.2d 652, 665 (Sup.Ct.N.J. 1949). See also: Pittston Co. v. O'Hara, 62 S.E.2d 34, 39 (Va. 1951); American General Corp. v. Camp, 190 A. 225, 231 (Md. 1937). Those courts would not read into the merger and appraisal statutes, rights and obligations not fairly expressed therein.

Nevada permits an award of interest only when authorized by statute. Paradise Homes v. Central Surety, 84 Nev. 109, 116, 437 P.2d 78, 83 (1968).[2] That authorization cannot be found in our merger and appraisal statutes, and it would be inappropriate to assume its presence under the guise of "construction."

2. Subordinately, the cross-appellants suggest that we may consider NRS 99.040(1) as statutory authorization for prejudgment interest. Briefly stated, their contention is that the stock certificates of the dissenters are "contracts" and carry interest at the rate of seven percent per annum "upon all money from the time it becomes due."

We have sometimes construed that statute to allow prejudgment interest. Paradise Homes v. Central Surety, supra; Dodd

have no rights with respect to such shares, except as hereinafter provided in this section and except the right as a creditor to receive payment therefor as aforesaid, and upon payment of the agreed fair cash value of the shares or of the value of the shares under final judgment the stockholder shall transfer his shares to the surviving or consolidated corporation."

[2]Legislatures elsewhere have provided for prejudgment interest. Note: 50 B.U.L. Rev. 57, 76 (1970).

v. Cowgill, 85 Nev. 705, 717, 463 P.2d 482, 490 (1969); Close v. Isbell Construction Co., 86 Nev. 524, 529, 471 P.2d 257, 265 (1970); Brandon v. Travitsky, 86 Nev. 613, 616, 472 P.2d 353, 355 (1970); State Farm Mutual Auto. Ins. Co. v. Christensen, 88 Nev. 160, 494 P.2d 552, 553, 554 (1972). In each instance, however, a legal wrong was visited upon the prevailing party to whom prejudgment interest was awarded. Here, the merger did not constitute a legal wrong to the dissenting shareholders. There was full statutory authority to do precisely what was done. Meade v. Pacific Gamble Robinson Co., 58 A.2d 415 (Del. 1948). The cited Nevada cases, therefore, are inapposite. Moreover, the stock certificates or "contracts" include the statutes governing corporations, Seaborn v. Wingfield, 56 Nev. 260, 48 P.2d 881 (1935), and our merger and appraisal statutes do not provide for prejudgment interest. For these reasons, I would reject the cross-appellants' argument that NRS 99.040(1) provides for prejudgment interest in this case.

3. The final argument offered for the allowance of prejudgment interest rests upon constitutional due process. It is suggested that the eminent domain requirement of just compensation should apply, by analogy, to a private corporate merger.

When private property is taken for public use through an exercise of the power of eminent domain, the requirement that the condemnor pay just compensation for the taking includes prejudgment interest where the taking occurs before judgment. Seaboard Air Line Ry. v. U.S., 261 U.S. 299, 306 (1923); Saunders v. State, 70 Nev. 480, 485, 273 P.2d 970, 972; Fibreboard Paper Products Corporation v. United States, 355 F.2d 752, 754 (9th Cir. 1966). In this circumstance, interest is a matter of constitutional right, since the requirement that just compensation be paid is written in the Constitutions, federal and state. U.S. Const. amend. V; Nev. Const. art. 1, § 8. Petersen v. School District of Bellevue, 196 N.W.2d 511, 512 (Neb. 1972). Statutory authorization is not necessary. Seaboard Air Line Ry. v. U.S., supra. I am not aware of any case, however, requiring the payment of interest in private actions as a matter of constitutional due process.

A private corporate merger is dissimilar to condemnation. A dissenter is not required to seek a fair cash value appraisal, but may elect to go along with the merger. In eminent domain, the taking is at the election of the condemnor. In a merger, the stockholder has agreed to be governed by the controlling

statutes. There is no contractual relationship between the condemnor and the property owner. Neither are the standards of fair cash value and just compensation necessarily synonymous. These substantial dissimilarities caused the court in Meade v. Pacific Gamble Robinson Co., 51 A.2d 313, 320 (Del. Ch. 1947), to reject the dissenters' contention that they were entitled to prejudgment interest as a matter of constitutional right. I would affirm the denial of prejudgment interest.

MOWBRAY, J., concurs.

